UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| **ACUITY, A MUTUAL INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:09 CV 336** |
| | ) | |
| **AUTO TECH AUTOMOTIVE INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION and ORDER

This matter is before the court on two motions for partial summary judgment, one filed by plaintiff Acuity, a Mutual Insurance Company ("Acuity") (DE # 33) and one filed by James Ebling, Sherri Ebling, and their business, Auto Tech Automotive, Inc. (collectively referred to as "the Eblings") (DE # 49). Each movant has also filed a motion to strike in connection with the aforementioned motions for summary judgment (DE ## 48, 54). For the reasons set forth below, all of the motions are denied.

## I.     BACKGROUND [1]

James and Sherri Ebling are a married couple and joint owners of Auto Tech Automotive, Inc. ("Auto Tech"). The Eblings purchased a "Bis-Pak" insurance policy from Acuity, the plaintiff in this case, to cover (amongst other things) property damage and legal liability. The policy provided coverage for both first-party and third-party claims. On November 29, 2004, a fire occurred at Auto Tech. The fire caused damage to

---

[1] Unless otherwise specified, the following facts are not in dispute.

the Auto Tech facility, vehicles, and other personal property belonging not only to the Eblings, but also to their employees and other individuals.

James reported the fire to Acuity, and Acuity began investigating the claim. Acuity's Field Claim Representative John Stevens attested via affidavit that "the purpose of the investigation, was, among other things, to determine the cause and origin of the fire, and the identity and value of items allegedly damaged therein. From the outset, the question of whether the fire was intentionally set was part of Acuity's investigation." (DE # 35-7 ¶ 6.)

On November 30, 2004, Stevens took a recorded statement from James, in which James asserted that while he did not start the fire, it began while he was working in the shop. James also stated that a road service truck, trailer, and large tool box were destroyed in the fire. On December 1, 2004, James reiterated his story that the three items were destroyed in the fire in a meeting with Stevens and Acuity's Senior Claim Representative Walter Bonnett. On December 8, 2004, James met with Acuity's Director of Special Investigations, Michael LaPointe. James once again repeated his story about the destruction of the road service truck, trailer, and tool box. James called his wife Sherri on the phone and passed it to LaPointe, at which time Sherri confirmed to LaPointe that the road service truck and trailer were inside Auto Tech at the time of the fire and were destroyed.

On December 10, 2004, Acuity performed a "dig-out" of the fire scene. No remains of the road service truck, trailer, or tool box were found. That day, LaPointe

confronted James about the lack of metal remains from the supposedly destroyed items. James continued to insist that the items were destroyed in the fire. A few hours later, James requested a meeting with LaPointe and admitted that the road service truck was not present at the Auto Tech facility during the fire. James then took LaPointe to his in-laws' home and admitted that he had parked the road service truck there. James continued to claim that the trailer and tool box were destroyed.

A month later, on January 10, 2005, LaPointe and Bonnett again met with James. James brought the Acuity representatives to the Auto Tech facility, where James showed them pieces of metal that he claimed were the remains of the trailer and tool box.

Meanwhile, the Valparaiso Police Department was pursuing its own investigation into the Auto Tech fire. On January 13, 2005, the department obtained a search warrant for a storage facility in Hebron, Indiana. Detective Michael McLinn, the officer executing the warrant, was informed by a superior officer that a trailer was located in the storage facility that had been reported by James Ebling as having been consumed in the fire at Auto Tech. The Valparaiso Police Department found James' trailer and tool box inside the storage facility. The record is vague as to what transpired in the weeks following the execution of the warrant, and it is unclear precisely when James and/or Acuity learned of the Valpairaso Police Department's search of the storage facility or discovery of the trailer and tool box.

On February 9, 2005, James again met with Bonnett. At this time, James provided Bonnett with a handwritten statement printed on a form entitled "Sworn Statement In Proof of Loss." On this form, James stated: "I told Mr. LaPoint[e] the trailer was in the building when it burnt + it was not. I was not attempting to defraud anyone I didn't want to tell my employees + other business owners in the building that my tools were ok + there's weren't." (DE # 35-9 at 2.) James also told Bonnett the location of the trailer and provided keys to it. James later claimed that immediately after his meeting with Bonnett on February 9, he talked to Detective McLinn for four hours. James claimed that Detective McLinn informed him that the police department was in possession of the trailer.

On February 14, 2005, James met with LaPointe and Bonnett and provided a recorded, oral statement regarding his misrepresentations. During the statement, James admitted: "I lied to you." (DE # 35-12 at 1.) James further admitted that the road service truck, trailer, and tool box were not inside of Auto Tech at the time of the fire, and that he had relocated these items to his in-laws' home before the fire. James also confirmed that after LaPointe confronted him with the fact that the dig-out provided no evidence consistent with his story, James moved the trailer (and presumably the tool box) to a storage facility. Finally, James admitted that he asked his wife Sherri to tell Acuity representatives that the road service truck and trailer were destroyed in the fire, even though Sherri knew that it was not true.

4

James asserted that he never intended to write up his estimate of losses to include the road service truck, trailer, or tool box. James' position is that he lied about the destruction of these items because he could not admit to his employees that all of their property was destroyed in the fire while his was not, and that he continued to lie about the destruction of the items because he thought Acuity would not handle his employees' claims until issues involving the truck, trailer, and tool box were resolved. Ultimately, the Eblings did not make a claim seeking compensation from Acuity for the service repair truck, trailer, or tools. Further, while Acuity does not address the issue squarely, it does not appear to dispute that none of the three items were actually covered under the Biz-Pak policy.

Later in 2005, James was charged with arson and insurance fraud in connection with the fire and the claim the Eblings filed with Acuity. James was acquitted of arson, and the insurance fraud charge resulted in a hung jury.

Acuity continued to investigate the Eblings' claim and eventually concluded that James intentionally caused the fire. Accordingly, Acuity determined that coverage for all claims arising out of the fire was excluded by the policy and denied coverage in July of 2009.

In the aftermath of the fire, a number of civil lawsuits were filed in Indiana state court involving Acuity, the Eblings, the Eblings' insurance agent, and other individuals whose property or property interests were affected by the fire. On October 14, 2009, Acuity filed the present suit in federal court, seeking a judgment declaring that it is not

5

required to pay any claims under the policy, nor does it owe any duty to defend or indemnify Auto Tech or the Eblings with respect to any third-party claims arising from the fire. Acuity alleged, amongst other things, that "concealment or misrepresentation of a material fact" or "fraud" on the part of the insured bars coverage for "any loss or damage." (Compl., DE # 1, Count III.) This court denied motions to dismiss or abstain from presiding over this case due to the pending state claims. (DE # 43.)

On August 24, 2010, Acuity moved for partial summary judgment on Count III of its complaint, seeking a declaration that James' misrepresentations[2] bar coverage for all first-party and third-party claims. (DE # 33.) Acuity relied on the following portion of the parties' contract (hereinafter referred to as "the misrepresentation clause") in support of its motion:

> CONCEALMENT, MISREPRESENTATION OR FRAUD
>
> We will not pay for any loss or damage in any case of:
>
> 1.     Concealment or misrepresentation of a material fact; or
> 2.     Fraud,
>
> committed by an insured at any time and relating to a claim under this policy.

---

[2] Acuity alludes to Sherri's misrepresentations as a possible basis for voiding the policy under the misrepresentation clause (*see, e.g.*, DE # 35-1 at 12), but then fails to develop this theory in any meaningful way. Therefore, for purposes of Acuity's motion, the court addresses Acuity's arguments only with regard to James' misrepresentations and their potential impact on the parties' insurance contract.

6

(DE # 35-3 at 2).[3] The Eblings responded (DE # 46), and Acuity replied (DE # 56).

Defendant Fred Weich also filed a response to Acuity's motion for summary judgment.[4]

(DE # 52.) The Eblings filed a motion to strike portions of the affidavit of Walter Bonnett

filed by Acuity in support of its motion (DE # 48); Acuity responded to this motion to

strike (DE # 55), and the Eblings replied (DE # 60).

Meanwhile, the Eblings filed their own motion for partial summary judgment.

(DE # 49.) In it, the Eblings argued that James' misrepresentations did *not* trigger

application of the misrepresentation clause and void the policy – essentially the reverse

of what Acuity argued in its motion. Acuity responded to the Eblings' motion (DE # 58)

and the Eblings replied (DE # 61). Acuity filed a motion to strike the Eblings' statement

of genuine disputes and their memorandum in support of their motion for summary

_____

[3] In his response to Acuity's motion for summary judgment, defendant Fred Weich argues that the misrepresentation clause cited by Acuity did not come into effect until after the fire occurred on November 9, 2004. (DE # 52-1 at 7.) In support of this argument, Weich provides a copy of the endorsement with an effective date of May 4, 2005.

This argument has no merit. The record contains several examples of the relevant endorsement, effective as of dates preceding the fire. (*See, e.g.,* DE # 35-3 at 2, 57 (policy effective August 27, 2004).) The validity of these documents has not been challenged by the Eblings *or* Weich. The fact that Weich has provided copies of the endorsement effective as of a later date proves only that the endorsement was in effect as of that later date; it does not show that the endorsement was *not* in effect prior to that date.

[4] Aside from the meritless argument addressed in the preceding footnote, the arguments made in Weich's relatively short response brief are essentially the same as some of the arguments made by the Eblings. Thus, for purposes of resolving Acuity's motion for summary judgment, the court refers to the Eblings' and Weich's arguments, collectively, simply as "the Eblings'" arguments.

judgment. (DE # 54.) Both the Eblings' and Acuity's motions for partial summary

judgment and their related motions to strike are fully briefed and ripe for ruling.

## II.    MOTIONS TO STRIKE

The Eblings have moved to strike one phrase from Bonnett's affidavit,

specifically Bonnett's statement that the "'road service truck, trailer, and large tool box

were items of significant value to Auto Tech's business.'" (DE # 48, citing Bonnett's Aff.,

DE # 35-10 ¶ 4.) The Eblings argue that Bonnett's statement is inadmissible because

Bonnett has not been qualified as an expert on the value of the items at issue. Because

the phrase in question is not critical with regard to any motion for summary judgment

analyzed in this opinion, the motion is technically denied as moot, but the court notes

that it has not considered this portion of Bonnett's affidavit in deciding the present

motions for summary judgment.

Acuity has moved to strike: 1) the Eblings' "Statement of Genuine Disputes,"

which the Eblings filed in response to Acuity's motion for summary judgment; and 2)

the Eblings' memorandum in support of the Eblings' own motion for summary

judgment. (DE # 54.) Acuity argues that the Eblings used the same factual statement for

both filings, and should not be permitted to claim that the same facts are "in dispute"

for the purposes of the former, but "undisputed" for purposes of the latter.

The motion is denied. Strictly speaking, neither party followed the procedures

for filing a statement of genuine disputes as set forth in N.D. IND. LOCAL RULE 56.1. In

order to expedite the process of resolving the present motions, the court closely

examined the parties numerous and technically inadequate filings, and discerned which facts were and were not in dispute. As it turns out, few facts that are relevant to the present motions for summary judgment are actually disputed. Both parties are reminded to review this district's LOCAL RULES, which are available at http://www.innd.uscourts.gov/docs/localrules/lr.pdf.

## III.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Legal Standard

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The parties' burdens in the context of a motion for summary judgment depend on whether the movant or the non-movant would ultimately bear the burden of proof on a disputed issue at trial. Where the movant would bear the burden of proof, the movant "must show that the evidence . . . is 'so one-sided that . . . [the movant] must prevail as a matter of law'" in order to obtain summary judgment in his favor. *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *Addicks Servs., Inc., v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010) (where movant also bears burden of proof, "movant must establish beyond peradventure" all essential elements in order to warrant judgment in his favor"); MOORE'S FED. PRACTICE 3d, § 56.13[1] (where party moves for summary

9

judgment and bears the burden of proof on the issue, it must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it).[5]

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.,* 45 F.3d 231, 234 (7th Cir. 1995).This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to RULE 56. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 774 (7th Cir. 1996); *O'Regan v. Arbitration Forums, Ins.,* 246 F.3d 975, 983 (7th Cir. 2001) (with cross-motions, the court must construe all inferences in favor of the party against whom the motion under consideration is made). The existence of cross-motions for summary judgment does not necessarily mean that

---

[5] Where the movant does not bear the burden of proof at trial, the oft-quoted rule of *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986), which involves the shifting of burdens between the movant and non-movant, applies. As explained in more detail below, each of the movants in this case is unable to meet its burden with respect to a matter on which it bears the burden of proof at trial; this means an early death for both motions for summary judgment, and further discussion of other disputed legal issues, which might impose a burden of proof on the non-movant, is wholly academic and unnecessary. Therefore, in this opinion, the court addresses only those issues on which the movants fail to sustain their burdens, and the only summary judgment standard that is necessary to apply is the one set forth in *Reserve Supply*; the burden-shifting standard of *Celotex* "is inapplicable." *Reserve Supply,* 971 F.2d at 42.

there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs,* 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. Mindful of these standards, the court addresses Acuity's and the Eblings' motions in turn.

### B.   Discussion

#### 1.   *Acuity's Motion for Summary Judgment*

Though there are many substantive legal issues disputed in the parties' briefs, Acuity's motion for summary judgment can be resolved with discussion of only one: the materiality of James' misrepresentations. As Acuity acknowledges, a showing of the materiality of a misrepresentation is essential to its success in voiding the policy due to the insured's violation of a misrepresentation clause (DE # 56-1 at 4); if Acuity does not ultimately prevail on the issue of materiality, it cannot prevail in this case at all. As discussed below, Acuity has failed to present sufficient evidence to establish as a matter of law that James' misrepresentations were material, and therefore summary judgment cannot be granted in its favor.

The most factually analogous Indiana case on the issue of materiality is *Insuremax Ins. Co. v. Bice,* 879 N.E.2d 1187, 1191 (Ind. Ct. App. 2008). *InsureMax* involved a car insurance policy issued by Insuremax to an individual named Gragh. Gragh's vehicle was involved in a car accident in Indiana, but the driver deserted the scene and was

11

never identified. The occupants of the other vehicle involved in the crash sued InsureMax for damages. *Id.* at 1189. During a deposition, Gragh testified that he was in the state of Georgia at the time that the accident occurred, implying that he could not possibly have been the driver. *Id.* Insuremax claimed that Gragh was lying and that the car insurance policy was void due to the misrepresentation clause. *Id.* at 1191. In response, Gragh argued that even if he were lying, his lie was not material to the issue of insurance coverage for the auto accident.

The Indiana Court of Appeals recited the two-definition materiality test outlined in *Colonial Penn Ins. Co. v. Guzorek,* 690 N.E.2d 664, 673 (Ind. 1997):

> 'Under one definition, a misrepresentation or omission is "material" if knowledge of the truth would have caused the insurer to refuse the risk or to charge a higher premium for accepting the risk . . . . A second approach to materiality in a case, such as this, where rescission is attempted after a loss has been incurred, would measure the materiality not against the underwriting decision, but rather against the loss. In other words, coverage of the incurred loss would be voided if the misrepresentation affected that risk, but not all coverage would necessarily be voided.'

*InsureMax,* 879 N.E.2d at 1191 (quoting *Guzorek,* 690 N.E.2d at 672–73).[6]

The *InsureMax* court noted that both approaches focused on "whether the misrepresentation had a significant impact on the insurer's decision-making process." *Id.* at 1191. Interpreting *Guzorek,* the *InsureMax* court held that Grahg's statement about

---

[6] *Guzorek* itself involved circumstances of the first variety – misrepresentations made in the course of procuring the insurance policy. Accordingly, the *Guzorek* court did not expand on the application of the second approach, which involves cases involving misrepresentations that were made after the policy was already in place and losses had been incurred.

his whereabouts was only material "if it caused InsureMax to take a substantially different position in responding to his potential liability." *Id.* at 1191-92.

In applying this principle, the court reasoned that InsureMax had chosen to defend against the third-party claim given Gragh's statement that he was in Georgia, but had not demonstrated that it would *not* have defended against the third-party claim if Gragh had admitted he was *not* in Georgia. In other words, there was not sufficient evidence showing that Gragh's statement regarding his whereabouts at the time of the accident had any impact on InsureMax's decision to defend against the third-party claim. The court further noted that InsureMax had not designated any evidence concerning its internal policies or decision-making process, so it was difficult to tell whether Insuremax would have taken a substantially different position in responding to its potential liability depending on Gragh's statements regarding his whereabouts. The court concluded that there remained a genuine issue of fact concerning the materiality of Gragh's alleged misrepresentations, and affirmed the trial court's denial of summary judgment. *Id.* at 1192.

In applying the *InsureMax* decision to this case, the court must first note that the parties do not appear to dispute that the truck, trailer, and tool box which James claimed were destroyed in the fire were not covered under the Biz-Pak policy. If this is true, then whether James lied about their destruction or not, James would never have received compensation for them. The Indiana Supreme Court in *Guzorek* and the Indiana Court of Appeals in *InsureMax* made clear that the materiality of a

13

misrepresentation is to be measured against the loss. *Guzorek,* 690 N.E.2d at 672-73; *InsureMax,* 879 N.E.2d at 1187; *see also Livingston v. Maryland Ins. Co.,* 10 U.S. 274, 281 (1810) ("[t]he effect of a misrepresentation or concealment, upon a policy, depends upon its materiality to the risk"). Because Acuity had no duty to compensate for the loss of the truck, trailer, and tool box, it is difficult to see how James' misrepresentations with regard to them were material. Acuity has presented no evidence providing clarity on this problem.

Even if the truck, trailer, and tool box were covered under the policy, this case, like *InsureMax,* lacks evidence from the insurer regarding the effects that the misrepresentations had on decisions to investigate and/or defend against the claim. Acuity has submitted an affidavit from William Bonnett, Acuity's Senior Claim Representative, who attested that he considered the presence or absence of property at the fire scene relevant to the question of whether the insured intentionally set the fire. (Bonnett Aff., DE # 35-10 ¶ 4.) But this statement only approaches the issue of materiality theoretically. Bonnett does not attest to how Acuity's decision to proceed with investigating and defending against claims was significantly impacted by James' statement. Acuity also submitted the affidavit of Michael LaPointe, in which LaPointe attests that Acuity commenced a "dig-out" of the fire scene "in order to investigate the cause and origin of the fire, as well as to attempt to locate the remains of the items the Eblings claimed were destroyed in the fire."(Aff. of Michael LaPointe, DE # 35-11 ¶ 7.) However, it is not clear from this statement if Acuity had planned to do a dig-out all

14

along or if it only decided to do so because of James' lies, and because the court is considering Acuity's motion for summary judgment, it must construe all inferences in the Eblings' favor. *O'Regan,* 246 F.3d at 983. In short, Acuity has not presented sufficiently convincing evidence that its decision-making process would have been significantly different if James had never said a word about the whereabouts of the truck, trailer, and tool box.

Because Acuity is moving for summary judgment *and* bears the burden of proof on the issue of materiality, it must show that the evidence on this issue is so one-sided that Acuity must prevail as a matter of law. *Reserve Supply,* 971 F.2d at 42. It simply has not done so. Because Acuity has not established that it is entitled to summary judgment on at least the issue of materiality, it is not entitled to summary judgment at all, and the court need not address the other legal issues presented in Acuity's motion.

### 2.     *The Eblings' Motion for Summary Judgment*

Acuity's failure to present sufficient evidence on the issue of materiality to justify summary judgment in its favor does not necessarily mean that summary judgment in the Eblings' favor is warranted. The Eblings' motion suffers from its own shortcoming, namely their inability to demonstrate that James corrected his lies to Acuity before Acuity relied upon them. As discussed below, the Eblings have the burden of proof on this point, but have failed to present sufficient evidence in their favor to warrant summary judgment.

15

The Indiana case instructive on the issue of reliance is *State Farm Fire & Casualty Insurance Co. v. Graham,* 567 N.E.2d 1139 (Ind. 1991).[7] In that case, the Indiana Supreme Court held that the jury was properly instructed that an insured's attempt to deceive an insurer was sufficient to establish the intent necessary to trigger an insurance contract's misrepresentation clause, unless the insured withdrew or corrected the misrepresentations "prior to reliance upon them by the insurance company." *Id.* at 1141. The court surmised that "[f]acts demonstrating a voluntary correction of error would be probative evidence on the issue of intentional concealment or misrepresentation." *Id.*

As a threshold matter, the court must determine which party has the burden of proof on the issue of reliance. As Acuity points out, and as the *Graham* court itself makes clear, the jury instruction approved by the Indiana Supreme Court in *Graham* did *not* create an additional element of detrimental reliance which insurers must establish in

_____

[7] Acuity argues that the court should focus less on *Graham,* and more on *Claflin v. Commonwealth Insurance Co.,* 110 U.S. 81 (1884), in which the United States Supreme Court, examining a case originating in Minnesota, considered an insured's argument that a misrepresentation clause should not have been enforced because he lacked intent to deceive the insurer. The insured argued that, although he had lied to the insurers about how he purchased goods that had been destroyed in a fire, his purpose in telling the lie was not to defraud the insurance companies, but to be consistent with statements he had previously made to a lending agency on a credit application regarding the goods. *Id.* at 96-97. The Supreme Court rejected this argument, holding that a misrepresentation clause is enforceable against an insured regardless of the insured's motives for lying to the insurer. *Id.*

Perhaps anticipating that the Eblings would defend themselves in this suit by arguing that James lied, not to deceive Acuity, but because he felt bad that his employees lost so much in the fire, Acuity argues that James' motivations for lying are irrelevant under *Claflin*. However, the Eblings do not attempt to argue that they are entitled to summary judgment due to James' pure motives. Thus, *Claflin* has no real bearing on the matters at hand and the court need not discuss it further.

order to have a policy declared void due to violation of a misrepresentation clause.[8] *Id.* Rather, "it establishes a final deadline, 'prior to reliance,' before which a misrepresentation must be withdrawn or corrected" in order for an insured to avoid operation of the clause against him. *Id.* Accordingly, this court holds that the Indiana Supreme Court, if it were presiding over this case, would hold that after an insurer demonstrates that an insured made a misrepresentation triggering a misrepresentation clause, the insured has the burden of proving that it withdrew its misrepresentations before the insurer relied upon them to prevent operation of the clause. Therefore, in this case, the Eblings must ultimately prove that Acuity did not rely upon James' misrepresentations before James withdrew them, if they wish to avoid the consequences of the misrepresentation clause contained in their insurance policy.

The court must also address Acuity's argument that *Graham's* holding regarding reliance was limited to situations involving a "momentary or inadvertent concealment or misrepresentation" which was "voluntarily corrected" by the insured. In so arguing,

---

[8] The Eblings attempt to argue that the Indiana Appellate Court's opinion in *Motorists Mutual Insurance Co. v. Johnson,* 218 N.E.2d 712, 715 (Ind. Ct. App. 1966), imposes upon insurers a burden to demonstrate prejudice in order to avoid payment on an insurance contract because an insurer furnished false information. *Johnson's* holding was cited by the Seventh Circuit Court of Appeals for the same proposition in *State Farm Mutual Auto. Ins. Co. v. Walker,* 382 F.2d 548, 551 (7th Cir. 1967). However, both *Johnson* and *Walker* dealt with "cooperation clauses," which require an insurer's cooperation in the processing of a claim. Such clauses are different than misrepresentation clauses, which prohibit false swearing in relation to a claim. In any event, to the extent that *Johnson* may have established a principle governing misrepresentation clauses, that principle was obviously overruled when the Indiana Supreme Court issued its opinion *in Graham*.

17

Acuity has taken the words of the *Graham* opinion slightly out of context. *Graham* did

not limit its holding to such situations. Rather, *Graham* stated two principles that are

relevant to determining whether a misrepresentation was intentionally made. First,

*Graham* held that momentary or inadvertent concealments do not qualify as having been

intentionally made. Second, *Graham* held that the voluntary nature of a correction is

probative of whether the misrepresentation was, in fact, intentionally made.

These principles do not relate to any facts in dispute in this case. James wrote a

statement in his own hand explaining that he lied to Acuity about his service truck,

trailer, and tool box because he didn't want to tell his employees that all of his

equipment survived the fire while theirs had not. There is no genuine issue about the

fact that James intentionally lied to Acuity, numerous times, about the whereabouts and

condition of his equipment.

The court now returns to the main issue: reliance. The Eblings argue that even if

James lied to Acuity about the truck, trailer, and tool box, James corrected his

misrepresentations before Acuity relied on those misrepresentations. In fact, the Eblings

argue, Acuity never relied on James misrepresentations at all, and thus James' eventual

withdrawal of those misrepresentations necessarily occurred "before" any reliance by

Acuity.

In order to assess the validity of the Eblings' argument, the court must determine

the definition of "reliance," as the Indiana Supreme Court would define that term. In

*Graham,* the Indiana Supreme Court held that the insurer's reliance need not be

18

"detrimental reliance" because such a rule would require that an insurer actually *pay* an insured before it can assert that the insured violated a misrepresentation clause, rendering the misrepresentation clause moot. 567 N.E.2d at 1141 (emphasis added). In other words, according to the Indiana Supreme Court, actions short of payment of a claim will suffice to establish an insurer's reliance, and the insurer's reliance need not have caused any detriment to the insurer. Beyond this comment in *Graham*, Indiana's courts have not clearly defined "reliance" in the context of what is required of an insurer in order to reap the benefits of a misrepresentation clause in an insurance contract.

"[W]here no Indiana cases adequately address the issues involved in a case, decisions of other jurisdictions may be instructive." *DiMaggio v. Rosario,* 950 N.E.2d 1272, 1275 (Ind. Ct. App. 2011). Other jurisdictions agree with the premise set forth in *Graham* that an insured is not required to pay on an insurance claim in order for reliance to be established sufficient to trigger the operation of a misrepresentation clause against an insured. *See, e.g., J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1486 n.16 (6th Cir. 1991) (interpreting Michigan law)*; Am. Fam. Mut. Ins. Co. v. Schley,* 978 F. Supp. 870, 876 (E.D. Wis. 1997) (interpreting Wisconsin law). In those cases, the courts held that less extreme actions, such as using the insured's misrepresentations as a starting point for the investigation, *Schley,* 978 F. Supp. at 875, and processing and investigating a claim according to false information provided by the insured, *J.C. Wyckoff,* 936 F.2d at 1486 n.16, were sufficient to establish an insurer's reliance. Given

19

the Indiana Supreme Court's decision in *Graham* and its explicit holding that payment of a claim is *not* required to establish reliance, this court finds that, if presented with the question, the Indiana Supreme Court would agree with the reasoning of cases like *Schley* and *J.C. Wyckoff* which hold that investigatory steps taken by an insurer, influenced by false information provided by the insured, are sufficient to constitute reliance.

The facts of this case, taken in a light most favorable to Acuity, *O'Regan,* 246 F.3d at 983, suggest that Acuity took some investigatory steps in light of the false information provided by James. On December 10, 2004, Acuity coordinated and executed a "dig-out" of the fire scene, "in order to investigate the cause and origin of the fire, as well as to attempt to locate the remains of the items the Eblings claimed were destroyed in the fire." (Aff. of Michael LaPointe, DE # 35-11 ¶ 7.) LaPointe attested that "[d]uring the dig out, I attempted to locate the remains of the items the Eblings claimed were present at the facility during the fire, including the road service truck, road service trailer and tool box. However, I was unable to locate these items, or any remains of these items, in the debris." (*Id.* ¶ 8.) LaPointe further stated that "[l]ater on December 10, 2004, I confronted James Ebling with the fact that I was unable to locate the remains of the road service truck or road service trailer at the fire scene. . . . However, James Ebling continued to insist these items were, in fact, present at the Auto Tech facility at the time of the fire." (*Id.* ¶ 9.) Approximately three hours later, "James Ebling requested to meet with me again. At this meeting, James Ebling admitted that the road service

20

truck was not present at the Auto Tech facility at the time of the fire (while continuing to insist that the road service trailer and large tool box were present and destroyed in the fire)." (*Id.* ¶ 10.) LaPointe also attested that he "met with James Ebling again on January 10, 2005 . . . . [A]t Ebling's request, we all proceeded to the Auto Tech facility, where Ebling showed us small pieces of metal which he claimed were remains of the road service trailer and large tool box that he had found at the fire scene." (*Id.* ¶ 12.) Bonnett was also present when James showed LaPointe small pieces of metal which he claimed were remnants of the destroyed truck. (Aff. of Walter Bonnett, DE # 35-10 ¶ 5.)

For purposes of analyzing the Eblings' motion, the court can infer that from November 30 to December 10, 2004, Acuity pursued evidence to confirm James' version of the events due to James misrepresentations, including commencing a dig-out of the fire scene, and expended personnel time and resources by holding meetings with James, sometimes at James' request, at which James would perpetuate his misrepresentations and provide false evidence in support of them. These actions on Acuity's part constitute "reliance" as this court has predicted the Indiana Supreme Court would define that term, and there is no dispute that these actions were taken prior to James's partial confession after the dig-out on December 10, 2004, or his full confession on February 9, 2005.

The Eblings bear the burden of proof on the issue of whether James' misrepresentations were corrected prior to Acuity's reliance on them, so they must show that the evidence is so one-sided that they must prevail as a matter of law. *Reserve*

21

*Supply,* 971 F.2d at 42. The Eblings have not done so, so they are not entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the court **DENIES** each of the following: the Eblings' motion for partial summary judgment (DE # 49); the Eblings' motion to strike portions of the affidavit of Walter Bonnett (DE # 48); Acuity's motion for partial summary judgment (DE # 33); and Acuity's motion to strike the Eblings' statement of genuine disputes and their memorandum in support of their motion for summary judgment (DE # 54).

**SO ORDERED.**

Date: January 17, 2012

 s/ James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT